**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 29, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

LEE ANN HELFRICH,

    Plaintiff Counter Defendant -
Appellant,

v.

BLUE CROSS AND BLUE SHIELD
ASSOCIATION,

    Defendant Counterclaimant -
Appellee,

and

BLUE CROSS AND BLUE SHIELD OF
KANSAS CITY,

    Defendant - Appellee.

No. 14-3179

UNITED STATES OF AMERICA;
ASSOCIATION OF FEDERAL
HEALTH ORGANIZATIONS,

    Amici Curiae.

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. No. 2:13-CV-02620-EFM-JPO)**

Matthew W.H. Wessler, Public Justice, P.C., Washington, D.C., (Sarah E. Belton, Public Justice, P.C., Oakland, California, and David A. Hoffman, Donald W. Vasos, Vasos Law Offices, Fairway, Kansas, with him on the briefs), for Plaintiff Counter Defendant - Appellant.

Anthony F. Shelley (Adam P. Feinberg, with him on the brief), of Miller & Chevalier Chartered, Washington, D.C., for Defendant Counterclaimant - Appellee Blue Cross and Blue Shield Association, and Defendant - Appellee, Blue Cross and Blue Shield of Kansas City.

Henry C. Whitaker, Assistant United States Attorney, Appellate Staff, (Joyce R. Branda, Acting Assistant Attorney General, Barry R. Grissom, United States Attorney, and Alisa B. Klein, Assistant United States Attorney, Appellate Staff, and Susan G. Whitman, Deputy Assistant General Counsel, U.S. Office of Personnel Management, Washington, D.C., with him on the brief) U.S. Department of Justice, Washington, D.C., for Amicus Curiae, United States of America.

David M. Ermer, Jason C. Suter, Ermer Law Group, Washington, D.C., for Amicus Curiae, Association of Federal Health Organizations.

---

Before **LUCERO**, **HARTZ**, and **HOLMES**, Circuit Judges.

---

**HARTZ**, Circuit Judge.

---

Lee Ann Helfrich received benefits through her federal-employee health-insurance plan, the Blue Cross and Blue Shield Service Benefit Plan (the Plan), for the treatment of injuries she sustained in a car accident. After Ms. Helfrich reached a settlement with the other driver's insurance company, Blue Cross and Blue Shield Association (BCBSA) and Blue Cross and Blue Shield of Kansas City (BCBSKC) sought reimbursement for the benefits paid, as provided in the terms of the Plan. Ms. Helfrich appeals from the

2

judgment of the United States District Court for the District of Kansas requiring her to reimburse BCBSA and BCBSKC (together Blue Cross) because the Federal Employees Health Benefits Act of 1959 (FEHBA) preempts a Kansas insurance regulation prohibiting subrogation and reimbursement clauses in insurance contracts. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm. Ms. Helfrich must reimburse Blue Cross because federal common law displaces the Kansas antisubrogation regulation, which, if applied to the Plan, would conflict with uniquely federal interests. Alternatively, giving weight to the views of the Office of Personnel Management (OPM) regarding the meaning of FEHBA's preemption provision, 5 U.S.C. § 8902(m)(1), we hold that the reimbursement provision in the Plan "relate[s] to the nature, provision, or extent of coverage or benefits," *id.*, and therefore supersedes state law.

## I.      BACKGROUND

### A.      The Plan

FEHBA establishes a program to provide health insurance for federal employees and annuitants. *See* 5 U.S.C. §§ 8901–8914 (2012 ed. and Supp. I). Its purpose is to provide affordable quality healthcare to government employees. *See Doe v. Devine*, 703 F.2d 1319, 1329 n.41 (D.C. Cir. 1983) ("FEHBA's goal is to ensure maximum health benefits for employees 'at the lowest possible cost to themselves and to the Government.'" (quoting H.R. Rep. No. 86-957, at 4 (1959))).

FEHBA authorizes OPM to enter into contracts with insurance carriers and promulgate regulations to carry out the program. *See* 5 U.S.C. § 8902(a); *id.* § 8913(a).

3

OPM has contracted with BCBSA for the Plan, which is administered by local Blue Cross and Blue Shield companies. *See id.* § 8903(1). Under FEHBA the federal government pays approximately 70% of an enrollee's premium, and the enrollee pays the remainder. *See id.* § 8906(b); 80 Fed. Reg. 29,203. Premiums from the government and enrollees are deposited into the Employees Health Benefits Fund within the United States Treasury. *See* 5 U.S.C. § 8909(a). BCBSA, like other experience-rated carriers, draws from the Fund as necessary to pay for benefit claims and administrative expenses, *see* 48 C.F.R. § 1632.170(b); *id.* § 1652.216-71(b), and the government pays a negotiated fee for its services, *see id.* § 1615.404-4. In other words, any premiums that are not used to pay benefits or administrative expenses remain the property of the government, and BCBSA earns its profit from the service fee. Community-rated carriers, in contrast, set premiums based on the attributes of the insured pool, receive premiums from the Fund, and pay benefit claims; the difference between premiums and the cost of benefits is their profit. *See id.* § 1632.170(a). Any surplus in the Fund may be used at OPM's discretion to reduce premiums or increase benefits. *See* 5 U.S.C. § 8909(b); 5 C.F.R. § 890.503(c)(2).

FEHBA requires that OPM's contracts with carriers "contain a detailed statement of benefits offered and shall include such maximums, limitations, exclusions, and other definitions of benefits as [OPM] considers necessary or desirable." 5 U.S.C. § 8902(d). The contract between OPM and BCBSA states that "[t]he Carrier shall provide the benefits as described in the agreed upon brochure text" attached as an appendix, J. App.,

4

Vol. 1 at 57; the brochure is "the official statement of benefits," *id.* at 131.[1] It provides

that the enrollee is "obligated to all terms, conditions, and provisions of [the] contract."

*Id.* at 58. Among those provisions is the grant to the carrier of the rights of subrogation

and reimbursement (sometimes collectively referred to as subrogation). The contract

states that if an enrollee receives benefits from the carrier for treatment of an injury

caused by a third party, "the Carrier shall have the right to be subrogated and succeed to

any rights of recovery against any person or organization from whom the [enrollee] is

legally entitled to receive all or part of those same benefits . . . ." *Id.* at 84. The carrier

may also be reimbursed—*i.e.*, "recover directly from the [enrollee] all amounts received

by the [enrollee] by suit, settlement, or otherwise from any third party or its insurer . . .

for benefits which have also been paid under [the] contract." *Id.* BCBSA is required to

make "a reasonable effort to seek recovery of amounts to which it is entitled to recover in

cases which are brought to its attention." *Id.* (It appears that this requirement does not

extend to pursuing subrogation (as opposed to reimbursement) because the carrier is not

"required to recover any amounts from any person . . . who causes an injury . . . for which

the [enrollee] makes claims for benefits." *Id.*). Reimbursement and subrogation

recoveries obtained by experience-rated carriers like BCBSA must be returned to the

Treasury Fund. *See* 48 C.F.R. § 31.201-5; *id.* § 1631.201-70(a),(g); *id.* § 1652.216-

---

[1] We use the language from the contract and brochure that were operative in 2012. Because Ms. Helfrich's treatment occurred in both 2012 and 2013, we will footnote any difference in the 2013 contract and brochure language.

5

71(b)(2)(i).  According to OPM, "FEHB carriers were reimbursed by approximately $126 million in subrogation recoveries in [2014]."  Federal Employees Health Benefits Program:  Subrogation and Reimbursement Recovery, 80 Fed. Reg. 29,203 (May 21, 2015).

The contract also provides that "[t]he Carrier's subrogation rights, procedures and policies, including recovery rights, shall be in accordance with the provisions of the agreed upon brochure text."  *Id*. at 61.[2]  The attached brochure says that if a third party causes injury to an enrollee and the Plan "paid benefits for that injury," all recoveries the enrollee obtains "must be used to reimburse [the Plan] in full for benefits [it] paid."  *Id.* at 140.  The Plan is entitled to reimbursement even if the enrollee is not "made whole" for all damages, and the Plan's right of recovery is "not subject to reduction for attorney's fees and costs"; but the Plan may, in its discretion, reduce its share of the recovery based on these considerations.  *Id.* (internal quotation marks omitted).  Further, if the enrollee does not seek damages, he or she must permit the Plan to initiate recovery on his or her behalf.  Finally, the Plan may "enforce [its] right of recovery by offsetting future benefits."  *Id.* at 141.

## B.    The Preemption Provision

---

[2] The 2013 contract includes additional language:  "The Carrier's subrogation rights, procedures and policies, including recovery rights, *for payments with respect to benefits* shall be in accordance with the provisions of the agreed upon brochure text."  *Id.* at 104 (emphasis added).

6

FEHBA's preemption provision, 5 U.S.C. § 8902(m)(1), states: "The terms of any contract under this chapter which relate to the nature, provision, or extent of coverage or benefits (including payments with respect to benefits) shall supersede and preempt any State or local law, or any regulation issued thereunder, which relates to health insurance or plans." In June 2012, OPM issued a letter to all FEHBA carriers expressing its position that contractual rights to reimbursement and subrogation fall within the purview of § 8902(m)(1) and thus override state laws that relate to health insurance or plans. On January 7, 2015, OPM published in the Federal Register a proposed rule addressing the preemption of state laws limiting subrogation and reimbursement. *See* 80 Fed. Reg. 931. After notice and comment, OPM promulgated the final rule on May 21, 2015 (while this litigation was pending). *See id.* at 29,203. The rule states, "All health benefit plan contracts shall provide that the Federal Employees Health Benefits (FEHB) carrier is entitled to pursue subrogation and reimbursement recoveries, and shall have a policy to pursue such recoveries in accordance with the terms of this section." *Id.* at 29,204 (codified at 5 C.F.R. § 890.106(a)). The rule also requires that contracts containing subrogation or reimbursement clauses "provide that benefits and benefit payments are extended to a covered individual on the condition that the FEHB carrier may pursue and receive subrogation and reimbursement recoveries pursuant to the contract." *Id.* (codified at 5 C.F.R. § 890.106(b)(2)). Finally, the rule declares that state laws limiting subrogation and reimbursement are preempted under § 8902(m)(1):

A carrier's rights and responsibilities pertaining to subrogation and reimbursement under any FEHB contract relate to the nature, provision, and extent of coverage or benefits (including payments with respect to benefits) within the meaning of 5 U.S.C. 8902(m)(1). These rights and responsibilities are therefore effective notwithstanding any state or local law, or any regulation issued thereunder, which relates to health insurance or plans.

*Id.* at 29,205 (codified at 5 C.F.R. § 890.106(h)).

### C. This Litigation

Ms. Helfrich is a federal employee enrolled in the Plan; BCBSKC administers the Plan in her area. In December 2012, Ms. Helfrich was in a car accident and suffered serious injuries. She received $76,561.88 in benefits from the Plan in connection with her injuries. Ms. Helfrich asserted a claim against the other driver in the accident and settled with the driver's insurer for the policy limit of $100,000. Blue Cross then sought reimbursement for the benefits paid according to the terms of the Plan. In response, Ms. Helfrich filed a petition against Blue Cross in Kansas state court seeking a declaration that the subrogation clause in the Plan is unenforceable under Kansas law and that § 8902(m)(1) does not preempt the Kansas antisubrogation regulation, which provides that "[n]o insurance company or health insurer . . . may issue any contract or certificate of insurance in Kansas containing a subrogation clause, or any other policy provision having a purpose or effect similar to that of a subrogation clause, applicable to coverages providing for reimbursement of medical, surgical, hospital, or funeral expenses." Kan. Admin. Regs. 40-1-20. The parties appear to assume that the regulation encompasses reimbursement claims by an insurer.

8

Blue Cross removed the case to federal court[3] and BCBSA filed a counterclaim seeking reimbursement of $76,561.88, a declaration that Ms. Helfrich was obligated to reimburse the Plan, and a declaration that a lien existed against Ms. Helfrich's settlement proceeds. Blue Cross moved for judgment on the pleadings, arguing that Kansas antisubrogation law is preempted under § 8902(m)(1) and, alternatively, that federal common law displaces the application of the Kansas regulation. The district court held that § 8902(m)(1) preempted Kansas law and granted judgment in favor of Blue Cross.

## II. DISCUSSION

"We review a district court's grant of a motion for judgment on the pleadings de novo, using the same standard that applies to a Rule 12(b)(6) motion." *Colony Ins. Co. v. Burke*, 698 F.3d 1222, 1228 (10th Cir. 2012) (internal quotation marks omitted). We affirm the district court's grant of judgment on the pleadings for Blue Cross on the grounds that (1) federal common law displaces the Kansas antisubrogation regulation and (2) the FEHBA preemption provision overrides the regulation. Although the district court did not address the first ground or some of the reasoning supporting the second, we can properly rely on them to affirm because Blue Cross raised them below, they were briefed, and Blue Cross raises them again on appeal. *See Havens v. Johnson*, 783 F.3d 776, 782 (10th Cir. 2015).

---

[3] Blue Cross first claimed federal jurisdiction under 28 U.S.C. § 1442(a)(1) but later also claimed diversity jurisdiction under 28 U.S.C. § 1332(a) (BCBSKC is a citizen of Missouri).

9

## A.  Federal Common Law

Blue Cross argues that federal common law displaces the Kansas antisubrogation regulation under the doctrine set forth in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988).  In *Boyle* a United States Marine helicopter copilot was killed when his helicopter crashed off the coast of Virginia.  *See id.* at 502.  The copilot survived the crash but was unable to escape from the helicopter and drowned.  *See id.*  The plaintiff, on behalf of the copilot's heirs and estate, brought a diversity action against the contractor that built the helicopter for the United States, claiming that it was liable under Virginia tort law for a defectively designed escape hatch, which opened out instead of in, *see id.* at 502–03, as stated in the contract specifications, *see id.* at 509.  Ultimately the Supreme Court held that even in the absence of an applicable statute, federal law protected a federal contractor against design-defect liability under state law if "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Id.* at 512.  Because the path taken by the Court to reach that conclusion is essential to our analysis, we review it in some detail.

First, the Court rejected the plaintiff's argument that it could not recognize a federal-law defense to the state design-defect claim in the absence of a statute conferring that immunity.  Although acknowledging the general validity of the plaintiff's position, it noted that "a few areas, involving uniquely federal interests, are so committed by the

10

Constitution and laws of the United States to federal control that state law is pre-empted and replaced, where necessary, by federal law of a content prescribed (absent explicit statutory directive) by the courts—so-called federal common law." *Id.* at 504 (citation and internal quotation marks omitted). The Court said that its precedents had identified two uniquely federal interests that "border[ed]" the dispute before it. *Id.* First, the Court "ha[d] held that obligations to and rights of the United States under its contracts are governed exclusively by federal law." *Id.* Second, the Court "ha[d] found to be of peculiarly federal concern, warranting the displacement of state law, . . . the civil liability of federal officials for actions taken in the course of their duty." *Id.* at 505.

*Boyle* did not precisely concern either interest; but the Court found the differences unimportant. "[T]he reasons for considering these closely related areas to be of 'uniquely federal' interest," said the Court, "apply as well to the civil liabilities arising out of the performance of federal procurement contracts." *Id.* at 505–06. Regarding the first interest, the Court acknowledged that the case did "not involve an obligation to the United States under its contract, but rather liability to third persons." *Id.* at 505. The contractor's design-defect tort liability, however, arose "out of performance of the contract" and such liability had been traditionally regarded as closely related to the contract for the allegedly defective item. *Id.* Similarly, the Court recognized that even though the case "involve[d] an independent contractor performing its obligation under a procurement contract, rather than an official performing his duty as a federal employee,"

11

in both circumstances "there is obviously implicated the same interest in getting the Government's work done." *Id.*

The Court concluded that these reasons made "civil liabilities arising out of the performance of federal procurement contracts" a matter of uniquely federal interest. *Id.* at 506. The Court added that this view was nothing new, pointing out that in 1940 the Court had held that a federal contractor could not be liable in a private suit for erosion allegedly caused by dike construction work, saying that "'if the authority to carry out the project was validly conferred, that is, if what was done was within the constitutional power of Congress, there is no liability on the part of the contractor for executing its will.'" *Id.* (brackets omitted) (quoting *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, 20–21 (1940)). Thus, although the dispute in *Boyle* was between private parties, the interests of the United States were still directly implicated. *See id.* at 506–07.

Displacement of state law, however, requires more than just the presence of a uniquely federal interest. "Displacement will occur only where . . . a significant conflict exists between an identifiable federal policy or interest and the operation of state law, or the application of state law would frustrate specific objectives of federal legislation." *Id.* at 507 (brackets, citation, and internal quotation marks omitted). Displacement of state law on these grounds could be necessary even if preemption of state law would otherwise not be in order:

> The conflict with federal policy need not be as sharp as that which must exist for ordinary pre-emption when Congress legislates in a field which the States have traditionally occupied. Or to put the point differently, *the fact*

12

> *that the area in question is one of unique federal concern changes what would otherwise be a conflict that cannot produce pre-emption into one that can.*

*Id.* at 507–08 (emphasis added) (citation, footnote, and internal quotation marks omitted). The extent of the preemption could vary. "In some cases, for example where the federal interest requires a uniform rule, the entire body of state law applicable to the area conflicts and is replaced by federal rules." *Id.* at 508 (citing *Clearfield Trust Co. v. United States*, 318 U.S. 363 (1943)). But in other cases "the conflict is more narrow, and only particular elements of state law are superseded." *Id.*

On the other hand, no conflict, no displacement. The Court discussed its prior opinion in *Miree v. DeKalb County,* 433 U.S. 25, 26–27 (1977), as an example of a case in which there was no adequate federal interest and no conflict with federal policy. In *Miree* the plaintiffs alleged that a plane crashed because the County had a garbage dump too close to the airport, closer than permitted in the County's grant contracts with the Federal Aviation Administration (FAA). *See id.* at 26–27. They argued that they could sue under state law as third-party beneficiaries of the contracts. *See id.* at 27. The Court held that state law, rather than federal common law, applied to the plaintiffs' claims because "[t]he operations of the United States in connection with FAA grants . . . would [not] be burdened or subjected to uncertainty by variant state-law interpretations regarding whether those with whom the United States contracts might be sued by third-party beneficiaries to the contracts." *Id.* at 30. "[A]ny federal interest in the outcome of the question before [the Court] [was] far too speculative, far too remote a possibility to

13

justify the application of federal law to transactions essentially of local concern." *Id.* at 32–33 (internal quotation marks omitted). In contrast, the federal interest in *Boyle* was quite real. As the *Boyle* Court said, "The imposition of liability on Government contractors will directly affect the terms of Government contracts: either the contractor will decline to manufacture the design specified by the Government, or it will raise its price." 487 U.S. at 507. Further, the plaintiffs in *Miree* were "not seeking to impose upon the person contracting with the Government a duty contrary to the duty imposed by the Government contract" but instead were seeking to enforce "the contractual duty *itself*." *Id.* at 508. *Boyle*, however, was "at the opposite extreme from *Miree*" because Virginia's tort-law duty of care was "precisely contrary" to the duty imposed by the government contract. *Id.* at 509.

Finally, *Boyle* had to formulate when a contractor's tort liability for a design defect that appears in the contract's specifications creates "a significant conflict with federal policy or interests." *Id.* (internal quotation marks omitted). Not every tort claim would present such a conflict. "If, for example, a federal procurement officer orders, by model number, a quantity of stock helicopters that happen to be equipped with escape hatches opening outward, it is impossible to say that the Government has a significant interest in that particular feature." *Id.*

For guidance, the Court turned to the Federal Tort Claims Act (FTCA). The FTCA waives sovereign immunity to allow suits against the United States for injuries caused by negligence or wrongful conduct by federal employees if a private person

14

would be liable for the same conduct. *See* 28 U.S.C. § 1346(b). The statute recognizes

an exception, however, for discretionary acts. Suit is not allowed on "[a]ny claim . . .

based upon the exercise or performance or the failure to exercise or perform a

discretionary function or duty on the part of a federal agency or an employee of the

Government, whether or not the discretion involved be abused." *Id.* § 2680(a). The

Court viewed "the selection of the appropriate design for military equipment . . . [as]

assuredly a discretionary function." *Boyle*, 487 U.S. at 511. And it thought:

> [S]tate tort suits against contractors would produce the same effect sought
> to be avoided by the FTCA exemption[, because] [t]he financial burden of
> judgments against the contractors would ultimately be passed through,
> substantially if not totally, to the United States itself, since defense
> contractors will predictably raise their prices to cover, or to insure against,
> contingent liability for the Government-ordered designs.

*Id.* at 511–12. The Court concluded that the contractor should not be liable in tort if the

government would not have been. "It makes little sense," said the Court, "to insulate the

Government against financial liability for the judgment that a particular feature of

military equipment is necessary when the Government produces the equipment itself, but

not when it contracts for the production." *Id.* at 512. In other words, in that

circumstance—when state law was contrary to a contract term actually selected by the

federal agency (a "discretionary" decision)—there would be a "significant conflict"

between government policy and state tort liability of the contractor. The requirements set

forth by the Court for contractor design-defect liability ensured that contractor immunity

15

would be available when the design defect was the product of a discretionary decision by the government.

In our view, the analysis in *Boyle* requires the displacement of the Kansas antisubrogation regulation in the context of the Blue Cross claim against Ms. Helfrich. The concurrence suggests that *Boyle*'s analysis applies only to the displacement of state *tort* law. But the policy considerations expressed in *Boyle* are independent of the nature of the state cause of action. The state laws addressed by the precedents relied on in *Boyle* were not just tort laws. *See, e.g.*, *Clearfield Trust*, 318 U.S. 363 (commercial paper); *Miree*, 433 U.S. 25 (third-party-beneficiary claim). *Boyle* introduced the FTCA's discretionary-function standard as simply a test to determine whether there was a significant conflict between a term of a government contract and state law—the conflict was significant if the term was the informed discretionary decision of the contracting officer. State law—whether tort law or otherwise—must yield if it conflicts with such a contractual term in an area of uniquely federal interests.

There can be little debate that the contract between BCBSA and the government and the provision of affordable quality healthcare to government employees are both matters of "uniquely federal" interest. "The United States no doubt has an overwhelming interest in attracting able workers to the federal workforce and in the health and welfare of the federal workers upon whom it relies to carry out its functions." *Empire Healthcare Assurance, Inc. v. McVeigh*, 547 U.S. 677, 701 (2006) (internal quotation marks omitted).

16

And the reimbursement provision in the Plan (whose negotiation by government officials "is assuredly a discretionary function,"[4] *Boyle*, 487 U.S. at 511) serves important purposes that are undermined by antisubrogation laws. For experience-rated carriers like Blue Cross, the money recovered through subrogation or reimbursement is used either to reduce premiums (paid largely by the government) or to increase coverage. *See* 5 U.S.C. § 8909(b); 5 C.F.R. § 890.503(c)(2). The conflict between the state regulation and the federal contractual requirement that Blue Cross pursue the reimbursement claim against Ms. Helfrich is a stark one, starker than in *Boyle*. In *Boyle* the prospect of tort liability could deter a contractor from doing the government's bidding or cause it to raise the contract price. Here, state law outright forbids Blue Cross from fulfilling its contractual obligation to bring a reimbursement claim.[5]

There is also a strong federal interest in uniformity that is undermined by allowing state law to override the subrogation and reimbursement requirements of the federal contract. *See United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728 (1979) ("federal

---

[4] Contrary to the assertion by the concurrence, the decision by OPM to include the subrogation provision in the Plan is the type of policy decision that is protected by the discretionary-function exception to liability under the FTCA. *See, e.g.*, *Garcia v. U.S. Air Force*, 533 F.3d 1170, 1175–76 (10th Cir. 2008).

[5] The concurrence suggests that collecting $126 million a year through subrogation and reimbursement is not a significant interest because that sum is a small fraction of total insurance premiums. But the size of that fraction is irrelevant. *Boyle* did not consider whether allowing tort claims against contractors would lead to a large percentage increase in the defense budget.

programs that by their nature are and must be uniform in character throughout the Nation necessitate formulation of controlling federal rules" (internal quotation marks omitted)). Recognition of state antisubrogation laws would create unfairness within the ranks of government employees. Those in states without such laws would have to pay reimbursements that are then used to benefit enrollees throughout the country, even those who live in states where they could keep their tort recoveries without paying reimbursements. *See FMC Corp. v. Holliday*, 498 U.S. 52, 60 (1990) ("Pennsylvania's antisubrogation law . . . requires plan providers to calculate benefit levels in Pennsylvania based on expected liability conditions that differ from those in States that have not enacted similar antisubrogation legislation. Application of differing state subrogation laws to plans would therefore frustrate plan administrators' continuing obligation to calculate uniform benefit levels nationwide."). The legislative history of FEHBA confirms the congressional interest in uniformity. In enacting the FEHBA provision preempting certain state laws (a provision we address more fully in the next section of the opinion), Congress expressed concern that the imposition of state-law requirements on FEHBA contracts would result in "[a] lack of uniformity of benefits for enrollees in the same plan which would result in enrollees in some States paying a premium based, in part, on the cost of benefits provided only to enrollees in other States." H.R. Rep. No. 95-282, at 4 (1977); *see also* 80 Fed. Reg. at 29,203 (supplementary information introducing OPM's recent rule explains that the preemption of state antisubrogation laws

18

"furthers Congress's goals of . . . enabling uniform, nationwide application of FEHB contracts").

The force of these propositions is especially strong in the context of the contract between BCBSA and OPM, because BCBSA acts as only a service agent between the federal government and its own employees, and the relationship between the government and its employees is generally immune from state interference. As explained above, BCBSA is an experience-rated carrier. BCBSA does not receive the premiums. They are deposited in a fund from which BCBSA withdraws the amount necessary to pay its administrative expenses and benefit claims. BCBSA does not have skin in the game; it does not underwrite the risk in the insurance coverage. It merely acts as a facilitator for OPM, presumably because its expertise provides cost savings and efficiencies for the program. If OPM chose to handle this service in-house, there would be no doubt that it could enforce a provision in the Plan requiring enrollees to make reimbursements out of tort recoveries. We are aware of no case allowing state law to override a requirement in a contract governing the relationship between the federal government and an employee, and there is hardly an area in which a state would have less of a legitimate interest than this employment relationship.[6] To allow state law to override a provision in such a contract would permit just the interference with federal functions that courts have refused

---

[6] We note, by the way, that the Kansas antisubrogation regulation apparently does not apply to self-insured single-employer plans. *See Unified Sch. Dist. 259 v. Sloan*, 871 P.2d 861, 867 (Kan. Ct. App. 1994).

to countenance.[7]  To paraphrase *Boyle*, it makes little sense to permit the government to

enforce a reimbursement requirement when it administers the Plan itself but not when it

contracts out the administration.  *See* 487 U.S. at 512 ("It makes little sense to insulate

the Government against financial liability for the judgment that a particular feature of

---

[7] *See United States v. New Mexico*, 455 U.S. 720, 735 (1982) (principal purpose of tax-immunity doctrine is "forestalling 'clashing sovereignty,' by preventing the States from laying demands directly on the Federal Government" (citation omitted) (quoting *M'Culloch v. Maryland*, 17 U.S. 316, 430 (1819))); *United States v. Seckinger*, 397 U.S. 203, 209 (1970) ("federal law controls the interpretation of the contract" between the United States and a private plumbing contractor); *United States v. Standard Oil Co.*, 332 U.S. 301, 305–06 (1997) ("Perhaps no relation between the Government and a citizen is more distinctively federal in character than that between it and members of its armed forces.  To whatever extent state law may apply to govern the relations between soldiers or others in the armed forces and persons outside them or nonfederal governmental agencies, the scope, nature, legal incidents and consequences of the relation between persons in service and the Government are fundamentally derived from federal sources and governed by federal authority."); *United States v. Allegheny Cnty.*, 322 U.S. 174, 183 (1944) ("The validity and construction of contracts through which the United States is exercising its constitutional functions [and] their consequences on the rights and obligations of the parties . . . present questions of federal law not controlled by the law of any state."); *Arizona v. California*, 283 U.S. 423, 451 (1931) ("The United States may perform its functions without conforming to the police regulations of a state."); *Johnson v. Maryland*, 254 U.S. 51, 56–57 (1920) ("[E]ven the most unquestionable and most universally applicable of state laws, such as those concerning murder, will not be allowed to control the conduct of a marshal of the United States acting under and in pursuance of the laws of the United States.  It seems to us that the immunity of the instruments of the United States from state control in the performance of their duties extends to a requirement that [employees of the United States Post Office] desist from performance until they [obtain driving licenses from the State].  Such a requirement does not merely touch the Government servants remotely by a general rule of conduct; it lays hold of them in their specific attempt to obey orders and requires qualifications in addition to those that the Government has pronounced sufficient." (citation omitted)); *Gilman v. United States*, 206 F.2d 846, 848–49 (9th Cir. 1953) ("the question of the duty owed by a Government employee to the Government is one to be determined by federal and not by state law"), *aff'd*, 347 U.S. 507 (1954).

20

military equipment is necessary when the Government produces the equipment itself, but not when it contracts for the production.").

The Seventh Circuit considered a similar issue in *Downey v. State Farm Fire & Casualty Co.*, 266 F.3d 675 (7th Cir. 2001), in which an insured brought suit against his insurer on a policy bought through the National Flood Insurance Program (NFIP). *See id.* at 678, 681–82. The court noted that under the program the private insurer, State Farm, remitted all premiums, minus a fee, to the Federal Emergency Management Agency (FEMA), and if the insurer paid a claim it was reimbursed by FEMA. *See id.* at 679. State Farm acted merely as an administrative agent, selling policies and processing claims for FEMA. *See id.* at 679–80. The court concluded that the federal interest justified the application of federal law to the suit:

> FEMA runs a federal program, and because it bears the risk on all NFIP contracts, FEMA's duties are at issue whenever an NFIP policy is interpreted. Replacing "FEMA" with "State Farm" in the caption of the case changes nothing; a judgment against State Farm and a judgment against FEMA have identical effects: FEMA pays. And though we were concerned with the formal parties to this action when we interpreted [a jurisdictional provision of the NFIP], here we are concerned with the federal *interest* invoked by the dispute's subject matter.[8]

*Id.* at 681.

The Supreme Court's decision in *O'Melveny & Myers v. FDIC*, 512 U.S. 79 (1994), does not conflict with our analysis. The Federal Deposit Insurance Corporation

---

[8] *Downey*'s holding that there was federal jurisdiction over the suit may not survive *McVeigh*, 547 U.S. 677, but this does not affect its discussion of the federal interest.

(FDIC), as receiver of a California-chartered federally insured savings and loan (S&L) sued attorneys who provided services to the S&L for negligence and breach of fiduciary duty with respect to fraudulent conduct by S&L officers. *See id.* at 81–82. One defense of the attorneys was that, under California law, knowledge of the fraud must be imputed to the S&L, and therefore to the FDIC. *See id.* at 82–83. The FDIC argued that federal, not state, law governed imputation and federal law would not recognize the defense. *See id.* at 83. The Court saw no conflict with federal law that would require the displacement of state law governing imputation. *See id.* at 85, 89. It observed that the FDIC had "identified *no* significant conflict with an identifiable federal policy or interest." *Id.* at 88.

Several statements by the Court might at first seem to argue against displacement of state law in our case. But not after a closer look. First, the Court rejected the FDIC's argument that California law could compromise federal interests because "state rules regarding the imputation of knowledge might deplete the deposit insurance fund." *Id.* (brackets and internal quotation marks omitted). The FDIC's argument proved too much. "[N]either [the relevant statute] nor the prior law sets forth any anticipated level for the fund, so what [the FDIC] must mean by 'depletion' is simply the forgoing of *any* money which, under any *conceivable* legal rules, might accrue to the fund." *Id.* In other words, a general interest in preventing the depletion of the fund was not sufficient because there was no limiting principle. In our case, however, the government's interest, which is not a lawyer's construct but is expressed in a federal contract, is not untethered; it is limited to

22

recovering funds to prevent the boon of double recoveries for some enrollees and to use the money instead to increase employee benefits or reduce premiums.

Second, the Court in *O'Melveny & Myers* declared that in that case "[t]here [was] not even at stake that most generic (and lightly invoked) of alleged federal interests, the interest in uniformity." *Id.* But here we have the federal interest in uniform treatment of federal employees—in particular, not requiring some to subsidize others in ways (such as an antisubrogation law) not available to all.

And finally, *O'Melveny & Myers* said that the Court would not "adopt a court-made rule to supplement federal statutory regulation that is comprehensive and detailed; matters left unaddressed in such a scheme are presumably left subject to the disposition provided by state law." *Id.* at 85. But this statement arose in the context of a statute that provided detail about the terms on which the FDIC could sue as receiver, creating "special federal rules of decision regarding claims by, and defenses against, the FDIC as receiver." *Id.* at 86. In contrast, FEHBA is silent regarding claims by insurers against enrollees or tortfeasors; subrogation and reimbursement rules are not mentioned. To be sure, FEHBA has a preemption provision; but even if the provision does not cover reimbursement claims (a proposition we reject in the next section of this opinion), that limitation cannot override the strong federal interests in displacing state law in our case. *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 869 (2000) (express "pre-emption provision, by itself, does not foreclose (through negative implication) any possibility of implied conflict pre-emption" (brackets and internal quotation marks omitted)); *Boyle*,

23

487 U.S. at 507–08 ("the fact that the area in question is one of unique federal concern changes what would otherwise be a conflict that cannot produce pre-emption into one that can" (footnote omitted)); *United States v. Northrop Corp.*, 59 F.3d 953, 961 n.4 (9th Cir. 1995) ("[W]e do not think that the Supreme Court in *O'Melveny* intended to foreclose the possibility of displacing, with a federal common law rule, a state rule of decision that would conflict with specific policies of a comprehensive federal scheme."); *cf. Freightliner Corp. v. Myrick*, 514 U.S. 280, 288 (1995) ("The fact that an express definition of the pre-emptive reach of a statute 'implies'—*i.e.*, supports a reasonable inference—that Congress did not intend to pre-empt other matters does not mean that the express clause entirely forecloses any possibility of implied pre-emption.").

Nor is our ruling in tension with *McVeigh*, 547 U.S. 677, a case in which a FEHBA insurer sought reimbursement from an enrollee out of a tort settlement. *McVeigh* did not say that state law necessarily controlled reimbursement claims under a FEHBA contract. It held only that there was no federal-question jurisdiction over such a reimbursement claim, thus requiring dismissal of the insurer's claim. *See id.* at 683. (There is no jurisdictional issue in our case, given the diversity of citizenship of the parties.)

On the issue of displacement of state law, *McVeigh*, if anything, supports our conclusion. It acknowledged the federal interest in reimbursement claims, saying that "distinctly federal interests are involved" in a carrier's claim for reimbursement (though these interests are not sufficient to confer jurisdiction). 547 U.S. at 696. In particular,

24

"reimbursements are credited to a federal fund, and the OPM–BCBSA master contract could be described as 'federal in nature' because it is negotiated by a federal agency and concerns federal employees." *Id.* The Court also noted the federal interest in uniform treatment of federal employees. *See id.* at 686 (purpose of § 8902(m)(1) is "[t]o ensure uniform coverage and benefits under plans OPM negotiates for federal employees").

To be sure, such federal interests do not necessarily require displacement. The Court explained that under *Boyle*, "the involvement of an area of uniquely federal interest establishes a necessary, not a sufficient, condition for the displacement of state law." *Id.* at 692 (ellipsis and internal quotation marks omitted). Noting that the Second Circuit had determined that the carrier had not shown a significant conflict between a federal interest and state law (no state antisubrogation law was mentioned), the Court said, "Unless and until that showing is made, there is no cause to displace state law, much less to lodge this case in federal court." *Id.* at 693. Implicit in this statement, however, is that a state regulation that directly conflicts with federal interests must be displaced. And the Second Circuit, without rebuke by the Supreme Court, said as much. *See Empire HealthChoice Assurance, Inc. v. McVeigh*, 396 F.3d 136, 142 (2d Cir. 2005) (Sotomayor, J.) ("We recognize the possibility that at a later stage in the proceedings, a significant conflict might arise between New York state law and the federal interests underlying FEHBA, such that the dispute would satisfy both prongs of *Boyle*. If, for example, [the estate's administrator] were to defend herself in reliance upon a state law that was meant to advance a particular state policy, [the carrier] could argue that such state law—whether

25

statutory or common law—conflicts with federal interests and requires the application of federal common law.  This possibility, however, is insufficient to confer federal jurisdiction.").   In this case there is certainly such a conflict, with the state law attempting to nullify a provision in the FEHBA contract.

Ms. Helfrich relies on *McVeigh*'s statement that "the reimbursement right in question, predicated on a FEHBA-authorized contract, is not a prescription of federal law."  *Id*.; *see also id*. (carrier's "contract-derived claim for reimbursement is not a creature of federal law" (brackets and internal quotation marks omitted)); *id*. at 692 (reimbursement and subrogation provisions in OPM-BCBSA contract "are linked together and depend upon a recovery from a third party under terms and conditions ordinarily governed by state law").  But even if that is of critical importance in determining whether a claim arises under federal law for purposes of federal jurisdiction, it is hardly dispositive on the issue of displacement of state law.  Indeed, the displacement issue (under federal common law) does not arise if a federal *statute* sets forth the controlling standard.  Although reimbursement is generally governed by state law, federal law may nonetheless displace aspects of that law.  After all, a design-defect tort claim is a creature of state law, but that did not preclude the displacement of part of that law in *Boyle*.  *See* 487 U.S. at 512.

We conclude that the Kansas antisubrogation regulation is displaced by federal law in this case.

B.    **Express Preemption**

26

Blue Cross also raises FEHBA's preemption provision as a ground for overriding the Kansas antisubrogation regulation. The provision states:

> The terms of any contract under this chapter which relate to the nature, provision, or extent of coverage or benefits (including payments with respect to benefits) shall supersede and preempt any State or local law, or any regulation issued thereunder, which relates to health insurance or plans.

5 U.S.C. § 8902(m)(1).[9]

The Supreme Court discussed this provision in *McVeigh*. Although the issue in that case was federal-question jurisdiction, not the preemption of state law, the Court's observations are nevertheless relevant. It said that the provision is "unusual in that it renders preemptive contract terms in health insurance plans, not provisions enacted by Congress," and thus "warrants cautious interpretation." *McVeigh,* 547 U.S. at 697. It also noted the provision's ambiguity, at least with respect to reimbursement:

> Section 8902(m)(1) is a puzzling measure, open to more than one construction, and no prior decision seems to us precisely on point. Reading the reimbursement clause in the master OPM–BCBSA contract as a condition or limitation on "benefits" received by a federal employee, the clause could be ranked among "[contract] terms . . . relat[ing] to . . . coverage or benefits" and "payments with respect to benefits," thus falling within § 8902(m)(1)'s compass. On the other hand, a claim for reimbursement ordinarily arises long after "coverage" and "benefits"

---

[9] Section 8902(m)(1) was originally enacted in 1978. Until amended in 1998, the preemption was more restricted. The provisions of a FEHBA contract preempted only "any State or local law, or any regulation issued thereunder, which relates to health insurance or plans *to the extent that such law or regulation is inconsistent with such contractual provisions.*" 5 U.S.C. § 8902(m)(1) (effective to Oct. 18, 1998) (emphasis added).

> questions have been resolved, and corresponding "payments with respect to benefits" have been made to care providers or the insured. With that consideration in view, § 8902(m)(1)'s words may be read to refer to contract terms relating to the *beneficiary's* entitlement (or lack thereof) to Plan payment for certain health-care services he or she has received, and not to terms relating to the carrier's postpayments right to reimbursement.

*Id*. (citation omitted, ellipses in original). The Court, however, did not need to choose between these "plausible constructions" because "even if FEHBA's preemption provision reaches contract-based reimbursement claims, that provision is not sufficiently broad to confer federal jurisdiction." *Id.* at 698.

Given the Supreme Court's statement that the provision is ambiguous regarding the preemptive effect of reimbursement clauses, Ms. Helfrich argues that we must apply the well-established presumption against preemption, *see, e.g.*, *Wyeth v. Levine*, 555 U.S. 555, 565 (2009), and conclude that Kansas law is not preempted. But that presumption does not apply here for much the same reason that, as discussed in the prior section of this opinion, federal law displaces the Kansas antisubrogation regulation. The Supreme Court has at least twice recognized a federal-interest exception to the general presumption against preemption.

In *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 344 (2001), individuals who claimed to have been injured by the implantation of orthopedic bone screws brought state tort claims alleging that a consulting company made fraudulent representations to the Food and Drug Administration (FDA) while seeking approval to market the screws. The Supreme Court held that the plaintiffs' state-law fraud-on-the-

agency tort claims were impliedly preempted by the Federal Food, Drug, and Cosmetic Act, as amended by the Medical Device Amendments of 1976 (MDA).  *See id*. at 344, 348.  Although common-law claims for fraud are a traditional feature of state common law, the Court did not apply the presumption against preemption because "[p]olicing fraud against federal agencies is hardly a field which the States have traditionally occupied."  *Id.* at 347 (internal quotation marks omitted).  "To the contrary, the relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law."  *Id.*  Further, the consulting company's "dealings with the FDA were prompted by the MDA, and the very subject matter of [the company's] statements were dictated by that statute's provisions."  *Id.* at 347–48.  Thus, the case did not implicate "federalism concerns and the historic primacy of state regulation of matters of health and safety."  *Id.* at 348 (internal quotation marks omitted).

Similarly, in *United States v. Locke*, 529 U.S. 89, 108 (2000), the Court said that "an 'assumption' of nonpre-emption is not triggered when the State regulates in an area where there has been a history of significant federal presence."  The issue in *Locke* was the preemption of state regulations governing tanker-ship operations and design.  *See id.* at 94.  The presumption against preemption was inapplicable because these laws touched upon "national and international maritime commerce," a field in which "Congress ha[d] legislated . . . from the earliest days of the Republic, creating an extensive federal statutory and regulatory scheme."  *Id.* at 108.

29

This court has followed that lead. In *US Airways, Inc. v. O'Donnell*, 627 F.3d 1318, 1325 (10th Cir. 2010), we considered whether New Mexico liquor laws applied to airline flights in the state. We said that the presumption against preemption did not apply to the preemption of a state's regulation of an airline's alcoholic-beverage service because "the field of aviation safety has long been dominated by federal interests." *Id.* at 1325 (internal quotation marks omitted). This despite the constitutional recognition of the state interest in regulation of liquor, *see* U.S. Const. amend. XXI, § 2 ("The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited."), which was discussed at length later in our opinion, *see O'Donnell*, 627 F.3d at 1329–31.

The federalism concern (respecting state sovereignty) behind the presumption against preemption has little purchase in this case. The preemption provision does not affect the relationships between private citizens. Section 8902(m)(1) governs only contracts for the benefit of federal employees. It is an understatement to say that "there has been a history of significant federal presence," *Locke*, 529 U.S. at 108, in the area of federal employment. Congress has legislated on the matter from the outset.

We therefore turn to the interpretation of the language of § 8902(m)(1) without consideration of the presumption. Again, state law is preempted with respect to the terms of a FEHBA contract "which relate to the nature, provision, or extent of coverage or benefits (including payments with respect to benefits)." § 8902(m)(1). Ms. Helfrich has

30

little to say on the matter beyond echoing what *McVeigh* said about the possibility that the terms *coverage* and *benefits* are limited to "Plan payment for certain health-care services [an enrollee] has received, and not to terms relating to the carrier's postpayments right to reimbursement." 547 U.S. at 697. Ms. Helfrich's view, as the Supreme Court said in *McVeigh*, is a plausible one. But the Court also said that the contrary view—the one taken by Blue Cross and by the United States as amicus—is also plausible. Our task, then, is to use the tools of statutory interpretation to arrive at the best construction of the preemption provision. In our view, these tools strongly support Blue Cross.

To begin with, the subrogation and reimbursement requirements in the Plan are tied directly to "payments with respect to benefits." § 8902(m)(1). They are triggered when a third party injures an enrollee and the Plan "pa[ys] benefits for that injury." J. App., Vol. 1 at 140. If the enrollee recovers from the third party, those recoveries "must be used to reimburse [the Plan] in full for benefits [it] paid." *Id.* The Plan may "enforce [its] right of recovery by offsetting future benefits." *Id.* at 141. And if the enrollee does not seek to recover from the third party, she must permit the Plan to initiate recovery on her behalf. Thus, a carrier's contractual right to reimbursement and subrogation arises from its payment of benefits; and an enrollee's ultimate entitlement to benefit payments is conditioned upon providing reimbursement from any later recovery or permitting the Plan to recover on the enrollee's behalf. No wonder that the reimbursement and subrogation requirements are contained in the Plan's "statement of benefits." *Id.* at 131. We note that several circuit courts have interpreted an ERISA provision authorizing civil

31

actions to "recover benefits due . . . under the terms of [a] plan," 29 U.S.C. § 1132(a)(1)(B), as encompassing suits disputing a plan's reimbursement efforts. *See Levine v. United Healthcare Corp.*, 402 F.3d 156, 163 (3d Cir. 2005) ("Where, as here, plaintiffs claim that their ERISA plan wrongfully sought reimbursement of previously paid health benefits, the claim is for 'benefits due' . . . ."); *Arana v. Ochsner Health Plan*, 338 F.3d 433, 437–38 (5th Cir. 2003); *Singh v. Prudential Health Care Plan, Inc.*, 335 F.3d 278, 291 (4th Cir. 2003). *But see Wurtz v. Rawlings Co.*, 761 F.2d 232, 242 (2d Cir. 2014).

Further, the reimbursement and subrogation provisions of the Plan have a second close connection to benefits. Any recovery through these provisions goes to a Treasury fund that may be used to reduce premiums or to increase benefits. *See* 5 U.S.C. § 8909(b); 5 C.F.R. § 890.503(c)(2).

The legislative history of § 8902(m)(1) also lends some support. The history reveals a concern about state interference with cost-cutting measures and the uniform treatment of federal employees across the nation. The House Report on the original measure expressed fear that the imposition of state-law requirements on FEHBA contracts would result in "[i]ncreased premium costs to both the Government and enrollees, and [a] lack of uniformity of benefits for enrollees in the same plan which would result in enrollees in some States paying a premium based, in part, on the cost of benefits provided only to enrollees in other States." H.R. Rep. No. 95-282, at 4 (1977); *see also* H.R. Rep. 105-374, at *9 (1997) ("this bill broadens the preemption provisions

32

in current law to strengthen the ability of national plans to offer uniform benefits and rates to enrollees regardless of where they may live"); S. Rep. 95-903, at *2 (1978) (purpose of preemption provision "is to establish uniformity in benefits and coverage" under FEHBA and "at the same time . . . to recognize the rights of states to determine who is to provide health services" (capitalization omitted)). In addition, Congress wanted to "prevent carriers' cost-cutting initiatives from being frustrated by State laws." H.R. Rep. No. 105-374, at 9 (1997). To be sure, nothing in this history specifically refers to reimbursement and subrogation; and Ms. Helfrich can fairly argue that the absence of such references implies that those procedures are exempted from the preemption provision. On balance, however, we think that the expressions of congressional intent suggest preemption here.

The position of Blue Cross has been embraced in the decisions by other federal courts, which have said that FEHBA preempts state laws limiting subrogation and reimbursement. *See Shields v. Gov't Emps. Hosp. Ass'n,* 450 F.3d 643, 648 (6th Cir. 2006), *overruled on other grounds by Adkins v. Wolever*, 554 F.3d 650, 652 (6th Cir. 2009); *MedCenters Health Care v. Ochs*, 26 F.3d 865 (8th Cir. 1994), *overruled on jurisdictional grounds by McVeigh*, 547 U.S. 677; *Bell v. Blue Cross & Blue Shield of Okla.*, No. 5:14-CV-05046, 2014 WL 5597265, at *6–8 (W.D. Ark. Nov. 3, 2014) (following *MedCenters*); *Calingo v. Meridian Res. Co.*, No. 11 CV 628(VB), 2013 WL 1250448, at *4 (S.D.N.Y. Feb. 20, 2013); *cf. Bryan v. Office of Pers. Mgmt.*, 165 F.3d 1315, 1320 (10th Cir. 1999) (interpreting § 8902(m)(1) broadly to preempt state law

33

allowing courts to award attorney fees to the prevailing party in a suit between an insured

and insurer).  The state courts are divided.  *Compare Thurman v. State Farm Mut. Auto*

*Ins. Co.*, 598 S.E.2d 448, 451 (Ga. 2004) (state law preempted), *and Aybar v. N.J. Transit*

*Bus Operations, Inc.*, 701 A.2d 932, 937 (N.J. Super. Ct. App. Div. 1997) (same), *with*

*Nevils v. Grp. Health Plan, Inc.*, 418 S.W.3d 451, 457 (Mo. 2014) (en banc) (No

preemption because "[t]he subrogation provision in favor of [the FEHBA carrier] creates

a contingent right to reimbursement and bears no immediate relationship to the nature,

provision or extent of [the enrollee's] insurance coverage and benefits . . . ."), *vacated*

*and remanded* 135 S. Ct. 2886 (2015),  *Kobold v. Aetna Life Ins. Co.*, 309 P.3d 924, 928

(Ariz. Ct. App. 2013) (same), *vacated and remanded* 135 S. Ct. 2886 (2015), *and*

*Hillenbrand v. Meyer Med. Grp., S.C.*, 720 N.E.2d 287, 292–94 (Ill. App. Ct. 1999)

(application of common-fund doctrine not preempted).

Strongly buttressing the decisions finding preemption is a recent regulation issued

by OPM, the agency responsible for administering FEHBA.[10]  FEHBA authorizes OPM

to "prescribe regulations necessary to carry out this chapter."  5 U.S.C. § 8913(a).  The

regulation, promulgated on May 21, 2015, requires all contracts to impose the

---

[10] Blue Cross could not have raised below an argument based on this regulation because
OPM had not yet proposed it.  But Blue Cross did argue that the district court should
defer to an OPM letter expressing its position that contractual rights to reimbursement
and subrogation fall within the purview of § 8902(m)(1).  In response to a request from
this court after OPM promulgated the final rule, the parties and the United States
submitted supplemental briefing regarding whether OPM's position in the final rule is
entitled to deference.

subrogation and reimbursement requirements as a "condition of and a limitation on the nature of benefits or benefit payments and on the provision of benefits under the plan's coverage"; describes the scope of the requirements; and concludes that they "relate to the nature, provision, and extent of coverage or benefits (including payments with respect to benefits) within the meaning of 5 U.S.C. § 8902(m)(1)." 80 Fed. Reg. at 29,204–05. The proposed rule, published on January 7, 2015, explained that this interpretation of § 8902(m)(1) furthers Congress's goal of reducing health-care costs because subrogation and reimbursement recoveries tend to lead to lower premiums, 70% of which are paid by the federal government; advances the federal interest in national uniformity in benefits and administration in order to avoid uncertainty, litigation, and disparate treatment of enrollees; and is consistent with OPM's understanding that a carrier's right to subrogation and reimbursement recovery is "a condition of the payments that enrollees are eligible to receive for benefits." 80 Fed. Reg. at 932; *see* 80 Fed. Reg. at 29203 ("Supplementary Information" preceding Final Rule).

Blue Cross and the United States argue that we must defer to OPM's interpretation of § 8902(m)(1) under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). They may be correct. Two years ago the Supreme Court emphasized the breadth of *Chevron*, holding that it applied even to statutory provisions that could be considered jurisdictional. It wrote:

> *Chevron* is rooted in a background presumption of congressional intent: namely, that Congress, when it left ambiguity in a statute administered by an agency, understood that the ambiguity would be resolved, first and

35

foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows. *Chevron* thus provides a stable background rule against which Congress can legislate: Statutory ambiguities will be resolved, within the bounds of reasonable interpretation, not by the courts but by the administering agency.

*City of Arlington v. FCC*, 133 S. Ct. 1863, 1868 (2013) (citation and internal quotation marks omitted). The Court noted that "[o]ne of [its] opinions explicitly says that no exception exists to the normal deferential standard of review for jurisdictional or legal questions concerning the coverage of an Act." *Id.* at 1871 (brackets and internal quotation marks omitted). With regard to preemption, the Court wrote, "We have even deferred to the FCC's assertion that its broad regulatory authority extends to pre-empting conflicting state rules." *Id.* "And," said the Court, "we have applied *Chevron* where concerns about agency self-aggrandizement are at their apogee: in cases where an agency's expansive construction of the extent of its own power would have wrought a fundamental change in the regulatory scheme." *Id.* at 1872. In response to the contention that *Chevron* deference was encroaching on matters of traditional local concern, the Court said, "[T]his case has nothing to do with federalism. [The applicable provision of the Telecommunications Act] explicitly supplants state authority by *requiring* zoning authorities to render a decision 'within a reasonable period of time,' and the meaning of that phrase is indisputably a question of federal law." *Id* at 1873. Rather, "[t]his is, at bottom, a debate not about whether the States will be allowed to do their own thing, but about whether it will be the [agency] or the federal courts that draw the lines to which they must hew." 133 S. Ct. at 1873 (internal quotation marks omitted). Moreover, the

36

delegation of general authority to promulgate regulations extends to all matters "within the agency's substantive field." *Id.* at 1874. Because "the whole includes all of its parts," courts need not try to discern whether "*the particular issue* was committed to agency discretion." *Id.* The Court concluded:

> Where Congress has established a clear line, the agency cannot go beyond it; and where Congress has established an ambiguous line, the agency can go no further than the ambiguity will fairly allow. But in rigorously applying the latter rule, a court need not pause to puzzle over whether the interpretive question presented is jurisdictional. If the agency's answer is based on a permissible construction of the statute, that is the end of the matter.

*Id.* at 1874–75 (internal quotation marks omitted).

Strong stuff. One could easily infer from this language that *Chevron* applies to an agency interpretation of a preemption provision in a statute it administers. And, indeed, the Court has applied *Chevron* in just that situation. *See Cuomo v. Clearing House Ass'n*, 557 U.S. 519, 525 (2009) (but finding agency's construction improper because statute's ambiguity did not stretch so far). Given the ambiguity in § 8902(m)(1), application of *Chevron* deference would require us to adopt OPM's reasonable view.

On the other hand, *Arlington* made no mention of the Court's repeated statements in recent years that it will merely give *some* weight to an agency's view on preemption,[11]

---

[11] *See PLIVA, Inc. v. Mensing*, 131 S. Ct. 2567, 2575 n.3 (2011) ("Although we defer to the agency's interpretation of its regulations, we do not defer to an agency's ultimate conclusion about whether state law should be pre-empted."); *Williamson v. Mazda Motor of Am., Inc.*, 562 U.S. 323, 335 (2011) ("the agency's own views should make a difference" (internal quotation marks omitted)); *Wyeth*, 555 U.S. at 576 ("In prior cases,
Continued . . .

although we note that in only two cases did the Court reject the agency position (which in neither case had appeared in a regulation promulgated by the agency)[12]. But we need not decide whether deference beyond "some weight" is required, because even under the less deferential standard we would adopt OPM's conclusion. As stated in *Wyeth*,

> [A]gencies . . . have a unique understanding of the statutes they administer and an attendant ability to make informed determinations about how state requirements may pose an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. The weight we accord the agency's explanation of . . . the federal scheme depends on its thoroughness, consistency, and persuasiveness.

555 U.S. at 577 (citation and internal quotation marks omitted). As the agency that has negotiated FEHBA contracts for federal employees for years, OPM has deep knowledge of the impact and interrelationships of contractual provisions. Its longstanding and

we have given 'some weight' to an agency's views about the impact of tort law on federal objectives when 'the subject matter is technica[l] and the relevant history and background are complex and extensive.'"); *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 326 (2008) ("We have found it unnecessary to rely upon that agency view because we think the statute itself speaks clearly to the point at issue. If, however, we had found the statute ambiguous and had accorded the agency's current position deference, the dissent is correct that—inasmuch as mere *Skidmore* deference would seemingly be at issue—the degree of deference might be reduced by the fact that the agency's earlier position was different." (citation omitted)); *Geier*, 529 U.S. at 883 ("We place some weight upon [the Department of Transportation's] interpretation of [the regulation's] objectives and its conclusion, as set forth in the Government's brief, that a tort suit such as this one would stand as an obstacle to the accomplishment and execution of those objectives." (original brackets and internal quotation marks omitted)); *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 495 (1996) ("our interpretation of the pre-emption statute is substantially informed by those regulations").

[12] *See PLIVA*, 131 S. Ct. at 2575 n.3 (rejecting view of U.S. amicus brief); Br. for U.S. as Amicus Curiae Supporting Resp'ts, *PLIVA, Inc. v. Mensing*, Nos. 09-993, 09-1039 & 09-1501 (U.S. Mar. 2, 2011); *Wyeth*, 555 U.S. at 580–81 (preamble to rule).

persuasively explained view that subrogation and reimbursement provisions are directly tied to employee health benefits and advance the congressional purposes served by § 8902(m)(1) is, in our view, of sufficient weight to persuade us to agree with its conclusion regarding preemption.

Ms. Helfrich contends that the district court's ruling implicates serious constitutional concerns because the Supremacy Clause does not permit contractual terms to preempt state laws, as § 8902(m)(1) provides. We are skeptical of this argument. The effect of the contractual provision here is no greater than the effect of the design specification in the contract in *Boyle*, where the Supreme Court held that the specification could override state tort law. *See* 487 U.S. at 512–13. And we note that then-Circuit Judge Sotomayor said in the Second Circuit opinion in *McVeigh* that the provision could be construed to avoid the constitutional problem. *See* 396 F.3d at 144–45 ("[W]e can reasonably construe § 8902(m)(1) as requiring that, in cases involving the 'terms of any contract under [FEHBA] which relate to the nature, provision, or extent of coverage or benefits,' *federal law* 'shall supersede and preempt any State or local law, or any regulation issued thereunder, which relates to health insurance or plans.' 5 U.S.C. § 8902(m)(1). . . . The federal law preempting state law may be federal common law or the FEHBA statute provisions themselves, but it must be law—not contract terms."). In any event, because Ms. Helfrich did not raise this argument below and has not argued for plain-error review on appeal, we need not address it. *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1130–31 (10th Cir. 2011). Ms. Helfrich says that she did not forfeit the

argument because "[i]t is the district court's *interpretation* of § 8902(m)(1) that pits the text of FEHBA's preemption provision against the Supremacy Clause," so the constitutionality of the provision "only arose when the district court rejected the narrow interpretation urged . . . below." Aplt. Reply Br. at 25 n.8. We disagree. When Blue Cross argued below that § 8902(m)(1) preempted the Kansas antisubrogation regulation, Ms. Helfrich had the opportunity to argue that § 8902(m)(1) was unconstitutional. There was no need to wait for the district court's interpretation. A party with two possible arguments to support its position cannot hold one in reserve and raise it on appeal only after losing on the other. *See Price v. Wolford, D.O.*, 608 F.3d 698, 706 ("A party must make its arguments before the court rules. It cannot keep an arrow in its quiver in reserve, for use in case the judge says at the end of the contest that all the expended arrows missed the mark.").

III.    CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.

40

14-3179, Helfrich v. Blue Cross and Blue Shield Association
**LUCERO**, J., concurring.

I join the majority as to part II.B. I write separately to express my disagreement

with my colleagues' application of federal common law preemption.

The majority primarily rests its analysis on Boyle v. United Technologies Corp.,

487 U.S. 500 (1988). Under Boyle, federal law preempts state law if: (1) the area of law

concerns uniquely federal interests; and (2) "a significant conflict exists between an

identifiable federal policy or interest and the operation of state law, or the application of

state law would frustrate specific objectives of federal legislation." Id. at 504-505, 507

(citations omitted). Because I agree that FEHB contract terms present uniquely federal

interests, the relevant question concerns Boyle's second prong, the "significant conflict"

requirement.[1]

A significant conflict with a federal interest exists if a claim is based on "the

exercise or performance or the failure to exercise or perform a discretionary function or

duty on the part of a federal agency or an employee of the Government." Id. at 511

(quotation omitted). This rule stems from a provision of the Federal Tort Claims Act

preserving government immunity against claims implicating agency discretion. Id.

(citing 28 U.S.C. § 2680(a)). The purpose of that provision was to "prevent judicial

---

[1] The second prong analysis is limited to the "significant conflict" requirement because there is no federal legislation concerning FEHB subrogation terms, aside from FEHBA's general preemption provision to which the federal common law analysis is inapplicable given our holding that the statute expressly preempts state anti-subrogation laws.

'second-guessing' of legislative and administrative decisions . . . <u>through the medium of an action in tort</u>." <u>United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)</u>, 467 U.S. 797, 814 (1984) (emphasis added).

Extending the rule to a contract claim unmoors it from its purpose. Declining to extend the rule to actions in contracts is consistent with <u>Boyle</u>, where the court essentially granted § 2680(a) tort immunity to government contractors. <u>See</u> <u>Boyle</u>, 487 U.S. at 530 (Brennan, J., dissenting) (stating that the decision is "premised on the proposition that any <u>tort</u> liability indirectly absorbed by the Government so burdens governmental functions as to compel us to act when Congress has not" (emphasis added)). Because the test <u>Boyle</u> enunciated is limited to actions in tort, I would not apply it to the contract claim in this case.

Moreover, even if we were to apply the <u>Boyle</u> test to a contract claim, the majority does not properly engage the test's second prong. The majority opinion does not define "significant conflict"; instead it spends several pages fortifying its conclusions that the federal interest in this case—the government's desire for system-wide uniformity and cost control—is significant, and that the conflict with state law is "stark." (Majority Op. 17.) But <u>Boyle</u> rejected the proposition that a "stark" conflict with state law is sufficient to support preemption. <u>Boyle</u>, 487 U.S. at 509 (even if state law is "precisely contrary to the duty imposed by the Government contract . . . , it would be unreasonable to say that there is always a significant conflict between the state law and a federal policy or interest"). The majority ignores this aspect of <u>Boyle</u> and instead reads the case as

-2-

affirming that "a state regulation that directly conflicts with federal interests must be displaced." (Majority Op. 25.)

I cannot agree. A "significant conflict" must arise from an act based on federal agency discretion. Boyle, 487 U.S. at 511. Courts have struggled to enunciate the boundaries of this discretion. See S.A. Empresa, 467 U.S. at 813 ("[I]t is . . . impossible . . . to define with precision every contour of the discretionary function exception"). But it must have a limit, lest it swallow the entire Federal Tort Claims Act. In Boyle, the Court concluded that a government decision was discretionary because it involved "not merely engineering analysis but judgment as to the balancing of many technical, military, and even social considerations, including specifically the trade-off between greater safety and greater combat effectiveness." 487 U.S. at 511. In the present case, the government decision is not as complex. Whether to include subrogation clauses in FEHB contracts implicates uniformity and cost-savings concerns, but does not implicate technical or military considerations, engineering analyses, tradeoffs between greater safety and greater combat effectiveness, or anything comparable. Instead, it simply involves a cost-benefit analysis weighing the value of additional funds in the federal coffer against that of an increase in the ability of federal employees to recover healthcare costs. This decision may involve some discretion—just as nearly every government decision does—but the balancing act falls well short of the level of discretion exercised in Boyle.

To understand the minimal importance of any discretion exercised in this case, it is instructive to consider the impact of subrogation (recovery from a third party) and

-3-

reimbursement (recovery directly from the insured) on the asserted goals of uniformity and cost. The federal government's interest in uniformity is undermined if FEHB contracts do not require insurers to pursue reimbursement or to recover under subrogation. But the contract at issue grants the insurer a significant role in pursuing both remedies. It provides that the insurer must make a "reasonable effort to seek recovery of amounts to which it is entitled to recover [through subrogation] in cases which are brought to its attention." But, the insurer "shall not be required to recover any amounts from any [third party]" under subrogation. And if, as in this case, the insurer seeks reimbursement directly from the insured federal employee, the contract permits— but does not require—the insurer to seek recovery, contrary to the majority's reading.[2] Thus, the insurer retains significant discretion in determining when to forego subrogation, and possesses full discretion in deciding if, when, and how to pursue reimbursement. The FEHB regime does not provide employees with uniform results because insurers can decide if they will recover, thereby allowing some federal employees to keep third-party recoveries while forcing others to pay them back. Federal employees thus pay higher premiums to support double recoveries for some policyholders subject to insurers' whims, just as they do when some states exempt their own citizens from subrogation

---

[2] To conclude that the insurer is required to use reasonable efforts to seek reimbursement, the majority first removes the reference to subrogation in the contract term that states "[t]he obligation of the Carrier to recover amounts through subrogation is limited to making a reasonable effort to seek recovery . . . ." (Majority Op. 5.) The majority then holds that this language does not apply to subrogation, and instead applies to an entirely separate clause governing reimbursement. I cannot agree with this reading.

-4-

provisions through the democratic process.

The amount of cost-savings afforded by subrogation and reimbursement likewise suggests that the government interest is not significant. Across all states (most of which allow subrogation clauses), total subrogation recoveries amount to approximately 0.3% of the premiums paid into FEHB. Moreover, as explained above, the government leaves the decision of when to pursue cost-savings to the insurers. If the government interests were truly significant, one would expect it to obligate insurers to pursue reimbursement and to recover through subrogation.

To conclude that the government interests in the case at bar deserve much weight, the majority analogizes FEHB insurers to the military contractors in Boyle, and observes that it makes little sense to insulate the government against liability where it produces equipment directly but not where it contracts for production. (Majority Op. 20-21.) This analogy merely raises the question: would agency discretion shield the government from financial liability if the government issued insurance directly, and not through private insurers? Not under § 2680(a) because the claim does not sound in tort. And even if it did, the impact of allowing subrogation terms in FEHB contracts does not rise to the level of import of the decisions at issue in Boyle.

The majority also errs in its attempt to distinguish O'Melveny & Myers v. FDIC, 512 U.S. 79 (1994). In O'Melveny the Court concluded that the government's general desire to avoid foregoing any money that might accrue to a federal fund was insufficient to support preemption without some limiting principle. Id. at 88. The majority states that

-5-

FEHB reimbursement provisions are "limited to recovering funds to prevent the boon of double recoveries for some enrollees." (Majority Op. 22-23.) But, if this is the limiting principle, it has no teeth. The contract terms are not limited to those cases involving double-recovery. To the contrary, the official statement of benefits expressly provides that the insurer may recover "even if [the insured] is not 'made whole' for all of [her] damages in the recoveries that [she] receive[s]." Helfrich alleges that the recovery from BCBS and from the offending driver's insurance together left $30,000 of her medical bills unaddressed. Accepting this well-pled allegation as true and construing it in the light most favorable to the plaintiff, Estes v. Wyoming Dep't of Transp., 302 F.3d 1200, 1203 (10th Cir. 2002), Helfrich did not receive a double-recovery. She did not even cover her costs. The reimbursement provisions are over-inclusive, as they allow more than just double recoveries, and under-inclusive, because insurers may decide not to collect even if the insured did receive a double-recovery. To the extent that preventing double-recovery is a limiting principle, it has no application in this case.

The majority's reasoning would exempt federal contracts from the contours of state law anytime the government finds that law economically inconvenient. We should not grant such broad authority to federal agencies. Instead, we should limit our preemption analysis to the relevant statute and the agency's implementing regulations. For these reasons, I do not join the majority's federal common law discussion.